

**FILED**

Dec 21 2016, 7:58 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT –
MOTHER

Steven J. Halbert
Carmel, Indiana

ATTORNEY FOR APPELLANT –
FATHER

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the
Parent-Child Relationship of:

O.G., II (Minor Child)
   and
K.T. (Mother) & O.G. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner*

December 21, 2016

Court of Appeals Case No.
49A02-1605-JT-1072

Appeal from the Marion Superior
Court

The Honorable Marilyn A.
Moores, Judge
The Honorable Larry E. Bradley,
Magistrate

Trial Court Cause No.
49D09-1505-JT-325

**Baker, Judge.**

[1] O.G. (Father) and K.T. (Mother) appeal the juvenile court's order terminating their parent-child relationship with O.G., II (Child). Father argues that the juvenile court erred by admitting certain evidence and both parents argue that there is insufficient evidence supporting the termination order. We find that the juvenile court erroneously admitted certain hearsay evidence. We also find that the evidence does not support the order terminating the parent-child relationship with either parent and reverse and remand for further proceedings.

## Facts

[2] On May 28, 2011, the Department of Child Services (DCS) removed Child after receiving a report that Child had been left with a family friend who could not contact Mother. At that time, Father indicated to DCS that both parents would test positive for marijuana. On June 1, 2011, DCS filed a petition alleging that Child was a child in need of services (CHINS). On June 21, 2011, the juvenile court adjudicated Child to be a CHINS after Mother admitted to the following:

> "[Mother] and [Father] have a history of domestic violence in their relationship, and there was a recent altercation where [Father] punched [Mother] in the face and choked her, causing her to lose consciousness. In addition, [Mother] admitted to and tested positive for recent marijuana use, and [Father] has pending charges for possession of cocaine."

DCS Ex. 12. The juvenile court later entered a dispositional decree ordering the parents to, among other things, refrain from use of illegal drugs or alcohol; complete substance abuse, parenting, and domestic violence assessments and

comply with all recommendations stemming from those assessments; submit to random drug screens; and refrain from acts of domestic violence.

[3] Mother and Father have a significant history of domestic violence. Mother's first domestic violence assessment led to a recommendation that she complete a 26-week domestic violence class; she failed to complete the classes. She then completed a second assessment, recanting the statements she made regarding Father in the first assessment. The assessor recommended a 26-week class, and this time, Mother completed the classes. In October 2011, Father was charged with felony battery and domestic battery, but Mother eventually recanted and the charges were dismissed.

[4] In August 2012, Child was returned to Mother's care and custody on a trial basis. DCS removed Child after it learned that Father had been in the home, apparently mistakenly believing that there was a no-contact order in place. The juvenile court, however, ordered Child returned to Mother's care because no such order had been entered. In February 2013, the juvenile court entered an order preventing Father from having contact with Child. Child remained in Mother's care and custody until May 31, 2013. Child was once again removed after Father went to Mother's home, kicked down her door, and attacked her. Mother called the police, as the safety plan in place required her to do, and Father was arrested.

[5] Mother testified that her romantic relationship with Father ended in late 2012. The only evidence in the record tending to dispute that testimony was the

testimony of the police officer who responded when Father broke down Mother's door. The officer testified that Mother told him that she and Father had been together for three years. The following discussion occurred on cross-examination:

> Attorney: Is it possible that she told you that they had been together for three years and not that they [were] currently together?
>
> Officer: It could be.
>
> Attorney: Is it fair to say that sitting here today, you can't specifically recall that [Mother] told you that she was in a current relationship with [Father]?
>
> Officer: That's correct ma'am.
>
> Attorney: And the call that you responded to was that he had kicked in a door. Right?
>
> Officer: Yes.
>
> Attorney: And so, would you agree with me that that's inconsistent with certainly having access to her home with a key. Right?
>
> Officer: One would say, think that, yes.

Tr. p. 288. On re-direct, the DCS attorney showed the officer his police report to refresh his recollection. He then testified as follows:

Attorney:     Ok, and what about the relationship that [Mother] described?

***

Officer:      Live in boyfriend of three years.

*Id.* at 290-91.

In November 2012, DCS had asked the juvenile court to order Mother to complete another domestic violence assessment; the court declined to do so. In June 2013, DCS referred Mother for a new assessment anyway, evidently based on the incident when Father invaded Mother's home. Mother participated in the assessment voluntarily. The professional who completed the evaluation testified that there was no evidence of a current violent relationship at that time. *Id.* at 19; *see also id.* at 30 (domestic violence assessor testified that there was no evidence of an ongoing violent relationship following April 2014 assessment). The Family Case Manager for DCS testified that she had no reason to think that Mother and Father were in a relationship prior to or during April 2014. Because Mother had already completed the 26-week program with that provider, the provider declined to accept her for another round. DCS failed to refer her to a different provider. At various times during the CHINS case, DCS referred Mother to domestic violence services. She completed the 26-week program once and did not complete it for any of the other referrals.

In August 2012, Mother participated in a mental health evaluation. The social worker who evaluated her diagnosed Mother with bipolar disorder and

recommended that she continue with homebased therapy and participate in a medication evaluation. In June 2013, Mother participated in a psychiatric evaluation. The psychiatrist diagnosed Mother with depression and anxiety, recommending that Mother continue with therapy. Additionally, the psychiatrist prescribed Mother thirty days of a mental health medication and asked that she return in thirty days to be re-checked. Mother did not return in thirty days. In 2014, after all DCS services had ceased, Mother went on her own to a mental health provider, at her own cost, for a medication evaluation. That provider recommended anger management classes, which Mother completed, again at her own cost. That provider also helped Mother to find the right mental health medication.

[8] Mother successfully completed homebased case management, as the case manager concluded that she did not need that service. *Id.* at 309-10. Mother participated inconsistently with homebased therapy, though some of it was not her fault, as multiple therapists left their employment while she was a client. She worked most successfully with Shimura Akins, between March 2014 and February 2015. Akins reported that Mother participated consistently aside from brief periods of incarceration. Mother made progress on all of her goals, visits with Child always went well, and the home she was living in—the same home she was living in at the time of the termination hearing—was safe and appropriate. Akins also stated that Mother was not in a relationship with Father at that time and had made significant progress by admitting to the history of domestic violence. With respect to Mother's mental health, Akins

testified that she had sought out a psychologist on her own, had changed her medication with the help of that provider, and was managing her emotions better as a result. *Id.* at 306. Akins recommended that Mother's parenting time be increased in the summer of 2014 and DCS refused to do so. Mother became incarcerated in 2015; Akins had to close the referral as a result of the incarceration but otherwise reported that Mother had been participating well with that service.

[9] Mother completed a substance abuse evaluation and no substance abuse treatment was recommended. Mother participated in random drug screens and there was no evidence presented at the hearing that she ever provided a dirty screen.

[10] Mother was incarcerated for relatively brief periods of time during the CHINS case. Specifically, she was incarcerated for approximately two weeks in June 2014, approximately one month in April 2015, and approximately one month in October 2015. *Id.* at 229-32.

[11] DCS had no concerns about Mother's parenting abilities, which is why Mother was never asked to complete a parenting assessment. The Family Case Manager (FCM) testified as follows:

> Attorney: . . . [I]sn't it fair to say that . . . [Mother] and [Child] have had a strong bond that you've been able to observe?
>
> FCM: Yes.

| Attorney: | She's a loving mother to him? |
|---|---|
| FCM: | Yes. |
| Attorney: | Ok, and in those observations that you've had with [Mother] interacting with [Child], he had a strong relationship with her as well? He was bonded with her. |
| FCM: | Yes he was. |

*Id.* at 234. The FCM also testified that Mother never stopped asking DCS or the juvenile court for reinstatement of her visits and services once they had been suspended. *Id.* at 234-35. Specifically:

| Attorney: | . . . [W]ouldn't you agree with me that she's never stopped trying to demonstrate that she can safely parent [Child]? |
|---|---|
| FCM: | She's made a requests [sic]. So, she's attempted. |
| Attorney: | Ok, and she's never stopped trying to get him placed back in her care or work towards that? |
| FCM: | Correct. |

*Id.* Mother had generally been consistent with visiting Child, and there were no indications at trial that any provider supervising those visits had any concerns. Mother's visits were suspended on March 31, 2015, and the last time she visited with Child was March 29, 2015.

[12] In April 2015, all of Mother's service referrals had been closed. She asked for a new referral for all services, and DCS refused. In July and October 2015, Mother asked the court to order all services and visits to be reinstated, and the juvenile court refused.

[13] At the time of the termination hearing, Mother was employed in a stable job and had just received a promotion. She was living with her mother, who had been an approved DCS placement during the CHINS case, and had been living there for approximately sixteen months. The FCM reported that Mother was employed more often than not during the CHINS case.

[14] Father was incarcerated throughout much of the CHINS case. The timeline of his incarcerations is not entirely clear from the evidence presented at trial, but Father testified as follows regarding the timeline:

- Father was incarcerated at the beginning of the CHINS case until the end of 2011.
- He became incarcerated again at the end of 2012 and was released in July 2013 with GPS monitoring. He cut off the GPS device and absconded from law enforcement for the next six to seven months.
- In December 2013, he began a work release program.
- In March 2014, he became incarcerated in a Department of Correction facility. He was released June 29, 2015.
- He was arrested in August 2015 for a parole violation and was incarcerated until January 2016.

Between January and summer of 2012, Father participated with homebased therapy, parenting time, and random drug screens, as well as completing a domestic violence assessment, before his incarceration in the summer of 2012,

but all services (including visits) were suspended following his 2012 incarceration. During one of his incarcerations, Father completed an anger management program and a parenting class. The FCM never contacted Father once, in any way, during any of his periods of incarceration. In November 2012, the juvenile court ordered that new service referrals be made for Father; the FCM failed to comply. In 2013, when Father was on work release, the FCM did not contact him or refer services for him. In 2015, when Father was released, he contacted the FCM and gave her his contact information and address—at that time, he was living with his grandfather. She did not contact him or go to his residence. He also requested that the juvenile court order that services and parenting time be reinstated, but the court refused.

[15] On May 14, 2015, DCS filed a petition to terminate the parent-child relationship between Mother, Father, and Child. The termination hearing was held during three days in January and February 2016. On April 28, 2016, the juvenile court entered an order terminating the parental rights of both parents, and both parents now appeal.

# Discussion and Decision

## I. Admission of Evidence

[16] First, Father argues that the juvenile court erroneously admitted certain evidence. The admission of evidence is entrusted to the discretion of the trial court, and we will reverse only where the trial court's decision is against the

logic and effect of the facts and circumstances before it. *D.B.M. v. Ind. Dep't of Child Servs.*, 20 N.E.3d 174, 178-79 (Ind. Ct. App. 2014), *trans. denied*.

[17] Father argues that certain evidence that was admitted by the trial court was inadmissible hearsay. Hearsay is a statement that is not made by the declarant while testifying at the trial or hearing and is offered into evidence to prove the truth of the matter asserted. Ind. Evid. R. 801(c). Hearsay evidence is generally not admissible. Ind. Evid. R. 802.

## A. Father's DOC Records

[18] First, Father contends that the juvenile court should not have admitted DCS exhibits 39, which is his DOC Record, and 40, which is his record from Putnamville Correctional Facility. DCS argues that Father waived this objection because, during the termination hearing, he objected to these exhibits only on the basis of hearsay and relevance, and did not specifically identify the business records exception to the hearsay rule. We find that the general hearsay objection was sufficient to preserve this argument for appeal. *See Ward v. State*, 50 N.E.3d 752, 756 (Ind. 2016) (cautioning appellate courts not to unrealistically "insist on detailed doctrinal arguments during the exigencies of trial," observing that an objection need simply be sufficient "to let the trial judge make an informed decision and prevent the objecting party from switching theories on appeal").

[19] Exhibits 39 and 40 are clearly hearsay, but were admitted under the exception for business records. Business records are admissible if:

(A)     the record was made at or near the time by — or from information transmitted by — someone with knowledge;

(B)     the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)     making the record was a regular practice of that activity;

(D)     all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(9) or (10) or with a statute permitting certification; and

(E)     neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Ind. Evid. R. 803(6). DCS did not offer the testimony of a custodian or other qualified witness for either of these exhibits; therefore, to be admissible, they must have been accompanied by a certification that complies with Rule 902.[1] Rule 902(11) provides that, "[u]nless the source of information or the circumstances of preparation indicate a lack of trustworthiness, the original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification under oath of the custodian or another qualified

---

[1] Evidence Rule 902 was rewritten effective July 1, 2014, and the subsection relevant to self-authentication of business records is now Rule 902(11).

person," is self-authenticating and requires no extrinsic evidence of authenticity to be admissible.

[20] For both exhibits, the affiant of the certification is the keeper of the records for DOC, but nowhere is it certified that the record was made from information by someone with knowledge, that the record was kept in the course of regular activity of the DOC, or that making the record was a regular practice of that activity. Additionally, the affidavit attached to exhibit 40 states that sixty-four pages are attached, but the exhibit contains only fifty pages. Exhibit 40 also contains many documents not readily identifiable as documents prepared by someone at Putnamville with personal knowledge; for example, Father's presentence investigation report, which was prepared by a probation officer, and abstracts of judgment, which are prepared by the trial court. As the certifications accompanying exhibits 39 and 40 do not qualify with Indiana Rules of Evidence 803(6) or 902(11), the juvenile court erred by admitting these documents into evidence.

## B. Testimony Regarding Father's Criminal History

[21] On direct examination, the Tippecanoe County FCM testified that she had concerns about substance abuse and domestic violence between the parties. Mother objected to further testimony regarding "a violent history with Father," and the trial court sustained the objection. Tr. p. 43. On cross-examination, Father elicited testimony that the FCM had learned that Father did not have a prior Child Protective Services (CPS) history. On redirect, over objection, DCS

elicited testimony that Father had a criminal history involving drugs and violence. Father objected on hearsay grounds, but the trial court overruled, finding that Father had opened the door to his criminal history by asking the witness about his CPS history.

[22] During the discussion regarding whether Father had opened the door, Father's attorney acquiesced to the fact that the door had been opened, simply arguing that "any criminal history is limited to whether or not there would be a felony conviction . . . ." *Id.* at 49. The FCM then testified that there was a "history of drug offenses and violent offenses," and Father did not object. *Id.* By agreeing to the admission of evidence of his felonious criminal history, Father invited any alleged error. *See Nichols v. State*, 55 N.E.3d 854, 862 (Ind. Ct. App. 2016) (noting that the invited error doctrine forbids a party to take advantage of any error that he commits or invites). As a result, we decline to address this issue.

## C. Guardian ad Litem Testimony

[23] Next, Father argues that the juvenile court erroneously permitted the Guardian ad Litem (GAL) to testify regarding what Child had told her he wanted. The juvenile court permitted the GAL to testify because of her responsibility to "be the voice of children" in court proceedings. Tr. p. 377. DCS does not direct our attention to any authority in rule, statute, or caselaw, that creates an exception to the hearsay rule for GALs, and we can find none.[2] As a result, this

---

[2] DCS seems to argue that because the juvenile court asked the GAL to "paraphrase," tr. p. 385, Child's words rather than relating his specific words. It is well established, however, that a summary of an out-of-

testimony was inadmissible hearsay and the juvenile court erred by permitting it.[3]

## II.  Sufficiency of Evidence

[24]  Next, both Mother and Father argue that there is insufficient evidence supporting the termination of their parental rights.

## A.  Standard of Review

[25]  Our standard of review with respect to termination of parental rights proceedings is well established.  In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013).  We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.*  Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.*  In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the

---

court statement is no less hearsay than repeating verbatim an out-of-court statement. *Blount v. State*, 22 N.E.3d 559, 563-65 (Ind. 2014).  Consequently, this argument is unavailing.

[3] DCS argues that Father has waived this argument because he did not object to the testimony at trial.  Mother, however, raised a hearsay objection, so the juvenile court addressed this precise issue before admitting the evidence.  We decline to find waiver under these circumstances.

judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[26] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A)    that one (1) of the following is true:
>
>> (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B)    that one (1) of the following is true:
>
>> (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons

for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

# B. Mother

[27] With respect to Mother, the juvenile court found that termination was in Child's best interests and that

> There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be remedied by his mother. Close to five years have elapsed since [Child's] CHINS case was filed and [Mother's] mental health and therapeutic needs, as well as the issue of domestic violence still need to be addressed when she does not feel she needs to and has "self-sabotaging" behaviors. [Mother] has also not demonstrated that she can maintain stability with independent housing, income and the ability to remain out of incarceration.

Father's App. p. 26-27.  The juvenile court also found, with respect to both parents, that

> Continuation of the parent-child relationship poses a threat to the well-being of [Child].  Without adequately addressing domestic violence, instability and untreated mental health issues, the parents cannot provide a safe and secure environment and raise [Child] in a healthy manner.  [Child] has been in the dependency system for almost all of his five years of life.  Continuation of the parent-child relationship only poses a barrier to obtaining permanency for [Child] through an adoption.

*Id.* at 27.

## 1.  Probability of Remedy of Conditions

[28]  As noted above, one of the ways to support a termination petition is for DCS to prove by clear and convincing evidence that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.  In this case, there are two general reasons Child was initially removed from Mother's care and custody:  ongoing domestic violence between Mother and Father, and drug use by Mother.  In addition to those concerns, reasons for Child's continued placement outside of Mother's care included concerns regarding Mother's mental health and, possibly, concerns regarding the stability of Mother's living situation and employment.  We will address each of these in turn.

### *a. Domestic Violence*

[29] By far, the most significant issue in the CHINS case was the domestic violence perpetrated on Mother by Father. And it is undeniable—indeed, Mother herself does not deny it—that violence in their relationship was a real and serious issue during the first eighteen months of the CHINS case. At certain points during that period of time, Mother even recanted her prior accusations of domestic violence in the context of Father's criminal proceedings and in the context of her own services.

[30] Mother did, however, complete a domestic violence assessment, followed by a 26-week domestic violence program. In November 2012, DCS asked the juvenile court to order Mother to complete yet another domestic violence assessment. Because Mother's homebased therapist did not believe that Mother needed to go through the classes again, the juvenile court denied the request. Notwithstanding the lack of a court order, Mother later voluntarily completed another domestic violence assessment. Over the life of the CHINS case, DCS demanded that Mother complete multiple assessments and take the same 26-week course no less than five times. At one point, the agency refused to accept Mother as a client because she had already completed its program. Mother informed the FCM, who neglected to refer the service to another agency. It is undisputed that Mother did, in fact, complete the assessment (more than once) and the 26-week program (once) during the CHINS case.

[31] Mother testified that she ended her romantic relationship with Father at the end of 2012. The FCM testified that she had no reason to believe that Mother and

Father were in a romantic relationship after the end of 2012. The provider who completed a domestic violence assessment with her in June 2013 said there was no indication of ongoing domestic violence at that time. Mother's homebased therapist testified that in March 2014 Mother and Father were not in a relationship. The provider who completed yet another domestic violence assessment in April 2014 said that there were no indications at that time of an ongoing violent relationship. The GAL testified that she had no reason to believe Mother and Father were in a relationship or had even seen each other since mid-2013. Tr. p. 399.

[32] Indeed, the only evidence of any violence between Mother and Father after the end of 2012 was the incident in the spring of 2013 when Father went to Mother's residence, broke down her door, and assaulted her. Mother did precisely what she was supposed to do pursuant to DCS's safety plan—she called the police. The responding officer had no recollection of whether Mother told him that she was in an ongoing relationship with Father at that time, and agreed that the fact that Father broke down the door indicated that he did not have keys to the residence. After reviewing his police report, the officer stated that Mother had described Father as a live-in boyfriend of three years.[4] Mother described the scene following the assault and her conversation with the officer as a "hectic situation" where "the officer doesn't necessarily care about the

---

[4] In fact, it is true that Father had been Mother's live-in boyfriend for multiple years in the past, long before the spring of 2013. That Mother labeled him as such in the midst of a stressful situation is unsurprising.

rundown of your, you know, your relationship. He doesn't care about the details. He just wants to know about the situation at hand." *Id.* at 440. So, essentially, Mother may have used shorthand to explain her relationship with Father to the officer. Regardless, this slim testimony from the officer does not constitute clear and convincing evidence of ongoing domestic violence in the spring of 2013.

[33] Moreover, even if we give DCS the benefit of the doubt and assume solely for argument's sake that Father and Mother were still in a relationship in the spring of 2013, there is *zero* evidence in the record of an ongoing relationship after that time. Specifically, in the *two and one-half years* between spring of 2013 and the termination trial in January 2016, there is not a scintilla of evidence suggesting that the parents were in a relationship of any kind.

[34] Mother's most successful therapeutic relationship during the CHINS case was with homebased therapist Shimura Akins, who worked with Mother between March 2014 and February 2015. During that period of time, Akins observed significant progress in Mother's ability to acknowledge the violence in her relationship with Father and its effects on Child:

> Attorney:   You testified that in her work with you, [Mother]
>             was able to articulate an understanding of the risks
>             of domestic violence on her relationship with
>             [Child] and for him. Right?
>
> Akins:      Yes.

Attorney: Did she ever tell you when or how she came to that understanding?

Akins: It was months after working with her. It wasn't immediate. I think just the toll of having to do all the services and just going through everything and having to prove yourself all the time. She got to that point where she was like, you know, I messed up, because when I first got her, she was so angry with DCS that it was just all about fighting DCS. So, after awhile, after we got a chance to get some of that off of her, then we could take a look at what's really going on and so, yeah. I would say by November [2014] that she kind of came to that conclusion.

*Id.* at 325-26. Akins elaborated, explaining that Mother

[g]ot to the point where she was able to say, I realize that I was in an abusive relationship and I stayed in it too long and my son has been involved in this for a very long time and she had a lot of regret and remorse about that and a lot of guilt for her son being in foster care.

*Id.* at 318. In other words, Mother did precisely what DCS had hoped for—she learned and benefitted from the services they provided her. She evolved and made progress on a number of issues, including domestic violence and its effects on her child.

[35] DCS and the juvenile court both focus heavily on the incident in the spring of 2013 when Father broke down Mother's door and assaulted her. We find it extraordinarily troubling to say that a parent who is a victim of domestic

violence, and has taken steps to end that relationship, deserves to have her parental rights terminated because the child's other parent assaulted her. The evidence in the record establishes that Mother struggled with breaking free of the domestic violence at the outset of the CHINS case, but completed a 26-week domestic violence program, ended her relationship with Father, and made significant progress in therapy with respect to the goal of processing the domestic violence in her life. There is no evidence in the record of any relationship of any kind between Mother and Father in the two and one-half years leading up to the termination hearing. We do not find that this evidence clearly and convincingly supports the juvenile court's conclusion that this reason—domestic violence—for Child's initial and continued removal from Mother will not be remedied.

### b. Substance Abuse

[36] A second reason for Child's initial removal from Mother was Mother's admitted marijuana use at that time. During the CHINS case, Mother completed a substance abuse assessment, which recommended no further substance abuse services. Mother completed a number of random drug screens, and there is no evidence in the record that she provided any problematic screens. In short, there is no evidence in the record supporting a conclusion that this reason—substance abuse—for Child's initial removal from Mother will not be remedied.

### c. Mother's Mental Health

[37]   Although it was not among the reasons for Child's initial removal, concerns about Mother's mental health arose during the CHINS case and likely contributed to Child's continued removal from her care and custody. In April 2012, Mother participated in a mental health assessment with a social worker, who diagnosed her with bipolar disorder and recommended a medication evaluation and continued participation in therapy. Pursuant to that recommendation, in August 2012, Mother participated in a psychiatric evaluation with a psychiatrist, who disagreed with the social worker's diagnosis and instead diagnosed Mother with depression and anxiety. The psychiatrist prescribed thirty days of medication for Mother with instructions to return in thirty days for a re-check; Mother did not return. Mother met with the same psychiatrist in 2013 with the same result—medication and instructions to return in thirty days, which Mother did not do.

[38]   Mother participated with homebased therapy during the CHINS case, albeit inconsistently. Her most successful homebased therapy relationship was with Akins, for a period of nearly a year leading up to February 2015. Akins reported that Mother participated well and made progress in all of her goals.

[39]   Akins also confirmed an important portion of Mother's testimony. Mother testified that after her services were suspended by the juvenile court in the CHINS case, and she asked for services to be reinstated and was denied (repeatedly), she went to a mental health provider on her own, participated in an assessment, and complied with the recommendations, including an anger

management class. According to Akins, "[Mother] did take it upon herself to seek out [a] psychologist and they changed her medication. She did that on her own towards the end of me working with her." Tr. p. 306. Akins confirmed that as a result, Mother began to better manage her emotions. *Id.*

[40] Because DCS ceased to provide Mother with services at some point during 2014 or 2015, there is no evidence in the record contradicting the testimony of Mother and Akins that, as of (approximately) the end of 2014, Mother was complying with mental health recommendations, taking prescribed medication, and showing improvement as a result. Here, again, DCS refused Mother's repeated pleas to re-refer services. Appallingly, the last time the FCM had even *spoken* with Mother was in July 2015—six months before the termination hearing took place. *Id.* at 204. Mother took the initiative and began participating in mental health treatment on her own. Therefore, the record reveals that in the year leading up to the termination trial, Mother had made significant progress with respect to her mental health. We cannot say that this is clear and convincing evidence that this condition—her mental health— contributing to Child's continued removal was unlikely to be remedied.

### d. Mother's Stability

[41] The final condition that likely contributed to Child's continued removal from Mother's care and custody was her stability, including housing, employment, and incarceration. With respect to housing, Mother had been living with her mother for over a year—sixteen months—leading up to the termination hearing. Her mother had been approved as a placement for Child during the

CHINS case, so the people who live in that home, and the home itself, met with DCS's approval. This certainly constitutes stable housing. With respect to her employment, it is undisputed that at the time of the termination hearing, Mother had stable employment. In fact, she had just received a promotion and a raise. *Id.* at 436. In general, Akins testified that Mother did not need homebased case management services because she was "resourceful" and had employment, a place to live, transportation, and insurance. *Id.* at 310. The FCM testified that for the most part, Mother maintained employment throughout the CHINS case. *Id.* at 203-04.

[42] It is undeniable that Mother had multiple, relatively brief, periods of incarceration during the CHINS case. Specifically, she was incarcerated for two weeks in June 2014, approximately one month in April 2015, and approximately one month in October 2015. *Id.* at 229-32. At the time of the termination trial, Mother had no pending criminal matters aside from a suspended driver's license, which she was working to have reinstated. While that is far from an illustrious record, the mere fact that Mother was incarcerated for an aggregate period of approximately four months during a five-year-long CHINS case, all while Child was not in her care, is far from sufficient to support a termination of her parental rights. *See In re K.E.*, 39 N.E.3d 641, 643 (Ind. 2015) (emphasizing that "incarceration is an insufficient basis for terminating parental rights"). We find that the evidence in the record does not clearly and convincingly support a conclusion that this reason—Mother's stability—contributing to Child's continued removal is unlikely to be remedied.

In sum, Mother struggled during the outset of this case. She was a nineteen-year-old first-time mother in a violent relationship with her child's father. She resented DCS's presence in her life and had untreated mental health needs. But slowly over the course of the CHINS case, she made progress. She ended the relationship with her batterer. She achieved stable employment and housing. She managed to get mental health treatment on her own. For a period of time, Child was even back in her care. But after Mother was again a victim of violence, DCS removed Child from her care, never to be returned. DCS stopped providing her with services and visits. Notwithstanding her pleas for over a year, she was never given another chance. Her arc over the course of the CHINS case, in all areas, shows self-awareness, improvement, and determination to do what needed to be done. We cannot say that this evidence remotely establishes that the conditions leading to Child's removal were unlikely to be remedied.

## 2. Well-Being of Child

Notwithstanding our conclusion above, as DCS needs to prove only one of the two relevant elements, we also need to address whether DCS established by clear and convincing evidence that continuation of the parent-child relationship posed a threat to Child's well-being. Without reiterating what has already been said herein, we note again that Mother had made progress on all of the issues leading to the initiation of the CHINS case and Child's removal.

[45]     As for the bond between Mother and Child and Mother's parenting skills, the evidence in the record is unanimous.

- The FCM testified that Mother's parenting of Child was not a concern for DCS. Tr. p. 209. The FCM agreed that Mother and Child had a "strong bond" and that she is a "loving mother to him[.]" *Id.* at 209, 234. Additionally, the FCM agreed that Mother has "never stopped trying to demonstrate that she can safely parent [Child]" and has "never stopped trying to get him placed back in her care or work towards that[.]" *Id.* at 234-35.
- Akins testified that she asked that Mother have more parenting time with Child (a request that was denied) because "it was obvious that they had a bond and he enjoyed the time that he had with his mom and he looked forward to it and . . . he would ask me, when are we, when am I coming back to visit[.]" *Id.* at 301. Visits between Mother and Child went well, and she met all of his needs during those times. *Id.* at 323.
- Akins stated that Mother and Child were bonded and that if increased parenting time had been granted, that bond would have been strengthened. She also testified that if she had been able to continue working with Mother, Child "could have safely been returned to her care at some point[.]" *Id.* at 330.
- The GAL testified that Mother and Child had a "strong relationship" and that Mother was "very in tune to [Child's] needs during visits." *Id.* at 393. Mother "was very comfortable with him and he was very comfortable with her." *Id.*

In other words, notwithstanding her own struggles, Mother loved Child, they had a strong bond, and no one had any concerns with respect to her parenting skills. At the time of the termination hearing in January 2016, she had not seen him since March 2015—because her visits were suspended. Despite Mother's repeated requests for visits to be reinstated, she had not seen her son for nearly a

year.  If this is anything other than DCS setting her up for failure, we cannot see what it would be.

[46]     We acknowledge the very real concerns about the need for stability in Child's life.  He has been in foster care for most of his life.  The need for permanency and stability in a child's life cannot be overstated.  However, that need cannot trump a parent's fundamental constitutional right to parent her child; nor can it trump the substantial bond that still existed between Mother and Child.  On this record, we do not find clear and convincing evidence that a continuation of the parent-child relationship posed a risk to Child's well-being.  Because DCS has not proved either of the required statutory elements by clear and convincing evidence, the juvenile court erred by terminating the parent-child relationship between Mother and Child.  We reverse and remand for further proceedings.

## C.  Father

[47]     Next, Father also argues that the evidence is insufficient to support the termination order.  The juvenile court found that there is a reasonable probability that the conditions that resulted in Child's removal from Father's care and custody will not be remedied:  "[Father] has demonstrated by his minimal effort at participating in services and court proceedings that he is unwilling to be a parent to [Child].  He has not addressed issues of instability and domestic violence, and has not demonstrated he can remain out of jail and available to parent."  Father's App. p. 27.  The juvenile court also found that

continuation of the parent-child relationship poses a threat to Child and that termination is in his best interests.

[48]     The timeline of Father's actions and incarcerations throughout the CHINS case is somewhat muddled, but we have reconstructed it here to the best of our ability.

- In June 2011, the CHINS case was filed. The FCM made no attempt to contact Father even though he was present at the initial CHINS hearing. DCS Ex. 11. In fact, the FCM did not contact Father until October 2011. Tr. p. 181.
- Father was incarcerated from June to November 2011.
- In February 2012, Father contacted the FCM, got involved with the CHINS case, and began participating in services, including homebased case management, homebased therapy, and random drug screens. *Id.* at 182-83. Father was not listed on the parenting time referral completed by the FCM. *Id.* at 185-86. Father also completed a domestic violence assessment and began participating with supervised parenting time. *Id.* at 186, 192. The FCM never dropped in on a visit involving Father so she had no way to evaluate his parenting skills or the bond with Child. *Id.* at 193.
- In February 2012, DCS made its first request of many to change Child's permanency plan to adoption. The juvenile court denied the request.
- In May 2012, Father attended a Child and Family Team Meeting. The FCM's notes indicated that Father was determined, competent, organized, and passionate. *Id.* at 191.
- Sometime after that meeting, the parents broke up. At that time, DCS changed its own internal case plan to reunification with Mother. *Id.* Around that time, Father told the FCM that he no longer wished to participate with services, as he believed his participation was futile. At that point, as DCS had decided that the plan was to reunify with Mother, the FCM stopped making any effort to contact Father, keep him apprised about the CHINS case, or notify him of team meetings. *Id.* at 192.

- In November 2012, the juvenile court ordered DCS to re-refer services for Father. The FCM failed to do so. *Id.* at 196, 242.
- Father was incarcerated from the end of 2012 through July 2013.
- In 2013, Father was placed on work release. He contacted the FCM, leaving her a voicemail telling her he had been released and notifying her of his location. She did not contact him or refer services. Father attempted to start domestic violence classes but was unable to because there was no open referral for him at that time. *Id.* at 410-11.
- In September 2013, the FCM reported to the juvenile court that Father no longer wished to participate in services. The last time she had spoken with him was nearly a year and a half earlier, in May 2012. *Id.* at 196-97.
- Father was incarcerated from March 2014 through June 2015 and from August 2015 through January 2016.
- At some point during 2015, Father asked the juvenile court to order DCS to make new service referrals for him. The court declined and DCS did not make any referrals. *Id.* at 243-44.
- In January 2016, Father was released from incarceration. He called the FCM and left her a voicemail telling her where he was located. She called the facility but did not go to see him, and never made contact with him after his release. *Id.* at 248-49.

[49] Never once during Father's multiple incarcerations did the FCM attempt to visit with or contact him in any way. She did not send him the CHINS court's orders, and did not inform him that there may have been services he could have completed while incarcerated. *Id.* at 187-88, 413-14. Notwithstanding the FCM's lack of direction, Father completed a parenting class while on work release and an anger management class while incarcerated. *Id.* at 409, 412. Father had gotten a job the day before the termination hearing and was living with his grandfather. *Id.* at 415.

[50] There is an extraordinarily troubling pattern of behavior in this case. The FCM made little to no effort to contact Father at the initiation of the CHINS case. And then, after DCS made its own internal decision that the case plan was to reunify Child with Mother, the FCM's minimal efforts to engage Father ceased altogether. While Father's own record is far from sterling, the evidence in the case establishes that, when he was not incarcerated, he made multiple attempts to contact the FCM and engage in services; furthermore, when he was incarcerated or on work release, he participated with services available to him.

[51] Our Supreme Court has recently reemphasized that "'[t]ermination is intended as a last resort, available only when all other reasonable efforts have failed.'" *In re R.S.*, 56 N.E.3d 625, 631 (Ind. 2016) (quoting *In re V.A.*, 51 N.E.3d 1140, 1151-52 (Ind. 2016)). In this case, it cannot be said that all other reasonable efforts have failed, given that DCS made an explicit internal decision that it would exercise no effort whatsoever to reunify Father with Child, and proceeded to follow through with that plan. Father has made multiple attempts to contact DCS and reengage with services, notwithstanding complete radio silence from the FCM during his periods of incarceration, and has been rebuffed at every turn. He deserves a genuine chance to prove that he can parent his child. It may be that he cannot meet that bar, but he has a constitutional right to try. Under these circumstances, we find that the evidence does not support the juvenile court's conclusion that Father is unwilling to be a parent to Child; nor does it support the conclusion that termination is in Child's best interests. Therefore, we reverse and remand for further proceedings.

The judgment of the juvenile court is reversed and remanded for further proceedings.

Mathias, J., and Pyle, J., concur.