ATTORNEY FOR APPELLANT

Don R. Hostetler
Hostetler Law LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana



FILED

Oct 21 2020, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of: O.G. II (Minor Child) and O.G. (Father)

O.G. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

October 21, 2020

Court of Appeals Case No. 20A-JT-272

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No. 49D09-1808-JT-1031

**Vaidik, Judge.**

# Case Summary

In December 2016, this Court reversed the termination of the parent-child relationship between O.G. ("Father") and K.T. ("Mother") (together "Parents") and their son, O.G. II ("Child"). In January of this year, the trial court again terminated the parental rights of both Parents. Father appeals, and we affirm.[1]

# Facts and Procedural History

The facts that follow are taken largely from our opinion reversing the first termination of Parents' rights. *See In re O.G.*, 65 N.E.3d 1080 (Ind. Ct. App. 2016), *trans. denied*. Father and Mother are the biological parents of Child, born in April 2011. In May 2011, the Department of Child Services (DCS) removed Child from Parents after receiving a report that Child had been left with a family friend who could not contact Mother. The following month, the trial court adjudicated Child to be a Child in Need of Services (CHINS) after Mother admitted there was a history of domestic violence between her and Father, that she tested positive for recent marijuana use, and that Father had pending criminal charges. Father was incarcerated from June 2011 until

---

[1] Mother also appeals. In a separate opinion issued today, we again reverse the termination of her rights, as discussed below. *See* Case No. 20A-JT-271.

November 2011.[2] In February 2012, he contacted DCS and began participating in services, including home-based therapy and random drug screening. He also participated in supervised visitation with Child, although no family case manager (FCM) ever attended with him to evaluate how the visits went.

[3] In May 2012, Father and Mother split up, and Father notified the FCM he no longer wished to participate in services. The FCM then ceased all contact with Father. In November, the court ordered DCS to re-refer services to Father, but it did not. Father continued to be incarcerated throughout the CHINS proceedings—including from December 2012 until approximately March 2013, from March 2014 until June 2015, and from August 2015 until January 2016. Father was also arrested for an April 2013 domestic-violence incident in which he broke into Mother's residence and attacked her while she had Child on a trial period. Because of this incident, DCS removed Child from Mother, and he has since remained in foster care.

[4] Several times when Father was released—in 2013, 2015, and 2016—he contacted DCS, either to give his location, ask for updates on the case, or to request service referrals. Each time, he was "rebuffed" by DCS, which never contacted him back or submitted new referrals for services. *In re O.G.*, 65 N.E.3d at 1096. In May 2015, DCS filed a petition to terminate the parent-child

---

[2] The timeline of Father's incarcerations presented throughout these proceedings is muddled, due in no small part to his conflicting testimony and the sheer number of incarcerations. We have reconstructed the timeline to the best of our ability.

relationship between Parents and Child. The termination hearing was held over three days in January and February 2016. In April 2016, the trial court terminated Parents' rights, and Parents appealed.

[5] In December 2016, this Court reversed the termination of parental rights, holding there was insufficient evidence supporting the termination. Regarding Father, we noted that despite Father's attempts to engage, DCS displayed an "extraordinarily troubling pattern of behavior" and "rebuffed" him at every turn. *Id.* DCS made "little to no effort to contact Father" or refer him to services. *Id.* We held Father "deserves a genuine chance to prove that he can parent his child. It may be that he cannot meet that bar, but he has a constitutional right to try." *Id.* Therefore, we could not say that the evidence supported the termination of Father's rights.

[6] In February 2017, the trial court changed the permanency plan back to reunification. That same month, however, Father was incarcerated for Level 6 felony strangulation and Level 6 felony escape after he violated home detention and attacked a random female walking on the Monon Trail. FCM Erin Bray-Mullens visited Father to update him on the case and provide her contact information. She also referred him to Simon Gelaye, who provided Father with Fatherhood Engagement Services. Father completed a four-to-six week domestic-violence course while incarcerated and working with Gelaye. When Father was released in January 2018, he did not notify DCS of his release. In April 2018, a new FCM—Kathryn Mosby—attempted to contact Father using various telephone numbers but could not reach him. That month, Father was

again incarcerated from April 13 to April 18. He was further incarcerated from July to August, August to October, and for over a week in December. During his periods of non-incarceration in 2018, Father did not communicate with DCS, nor did he attend the CHINS review hearings. In August 2018, the trial court changed Child's permanency plan to adoption, and DCS again petitioned to terminate both Parents' rights.

[7] In late December 2018, Father contacted DCS. FCM Mosby put in a referral for him to participate in a batterer's intervention group. Of the 26-week program, Father attended only four weeks before being discharged "due to attendance." Tr. Vol. IV p. 78. His contact with DCS was sporadic, with him having only "two conversations" with FCM Mosby throughout her time on the case. *Id.* at 101. Father also struggled to maintain housing when he was not incarcerated, changing residences at least three times between January 2017 and December 2018. Father continued his pattern of incarceration in 2019—for two weeks in January 2019 and for a week in March 2019.[3]

[8] The termination trial occurred over numerous days in May, August, and October 2019. The primary issues were Child's emotional struggles and need for stability. Child's therapists, Kristy Walters and Melissa Porter, testified that Child displayed concerning behavior—increased agitation, hitting, screaming—

---

[3] Documents available on the Odyssey casemanagement system indicate that Father was convicted of Class B misdemeanor criminal mischief on August 2, 2017, Level 6 felony strangulation and Level 6 felony escape on August 8, 2017, and Level 6 felony residential entry on September 3, 2019.

during the reunification process, primarily during therapy or attempted visits with Mother. Walters concluded that based on Child's emotional struggles, it was "not in his best interest to leave his [foster family]." Tr. Vol. III p. 140. FCM Mosby testified that Father had failed to "show that he could provide [Child] with a safe and stable home environment" and that "it would not be in the best interest of the child to be reunified with a parent that he doesn't have a relationship with." Tr. Vol. IV pp. 102, 107. Patti Cavanaugh, Child's guardian ad litem, also recommended termination, stating that Child and Father had not seen each other "since 2012 or 2013" and that Father "has not demonstrated the ability to have a safe, stable, loving home." *Id.* at 194.

[9] Dr. Laura McIntire, a psychologist who evaluated Child and Parents in 2017, testified that Child had significant anxiety. Child expressed fear to her of leaving his foster family and told her he remembered seeing domestic violence between Parents. Dr. McIntire and Mother's expert witness, Dr. Kimberly Lakes, agreed this is unlikely to be an accurate memory, as Child would have just turned two at the time, too young to have remembered such an event.

[10] The trial court terminated Parents' rights.

[11] Father now appeals.

# Discussion and Decision

[12] Father challenges several of the trial court's findings of fact and conclusions.

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

# I. Findings of Fact

[15]  Father argues the evidence does not support several of the trial court's findings of fact. We first address Father's challenge to a portion of Finding 41: "During the 2017 evaluation, [Child] indicated that he had witnessed violence in the home of his biological parents." Appellant's App. Vol. II p. 27. Father argues this fact is misleading because it "suggests Child in fact had a memory of witnessing violence, when the evidence established it was impossible for a two-year-old [c]hild to have such a memory." Appellant's Br. p. 35. As an initial matter, we note that this is a mere recitation of a statement made by Child, not a finding of fact. *See In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003) ("A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact."). Listing such recitations as findings of fact leads to the exact issue we have here: a finding that is technically true in that the declarant did actually make the statement, but evidence in the record shows the statement is inaccurate. We agree this finding is misleading because it suggests Child witnessed violence when all other evidence in the record—namely both Dr. McIntire and Dr. Lakes testifying Child is unlikely to have memories of that time period due to his young age—

shows he could not have remembered such an event. However, we find that misstatement harmless. This finding is far from the only domestic-violence finding relating to Father. He and Mother had a history of domestic violence, and he has been incarcerated for domestic violence or battery several times throughout these proceedings. And at least one of these incidents occurred while Child was with Mother—when Father broke into her residence and attacked her in 2013. Therefore, the crux of the finding—that Parents engaged in domestic violence in the presence of Child—is true, regardless of how Child received this information.

[16] Father also argues the evidence does not support Finding 19: "In April 2014, a domestic violence incident occurred in which [Father] kicked in the door to [Mother's] home and attacked her in the presence of the child." Appellant's App. Vol. II p. 26. We agree, and DCS concedes, that the incident actually occurred in April 2013. Father, however, fails to explain how this (likely typographical) error prejudiced him.

[17] Father next challenges Finding 38, that Dr. McIntire's "Fall 2017 evaluation was to develop a plan for parenting time to resume between the child and his parents." *Id.* at 27. Father argues Dr. McIntire's report shows her services were only to prepare a plan for Child to have visits with Mother. We agree, and DCS concedes, that this plan for parenting time was only focused on Mother, and thus the finding is inaccurate.

[18] Father challenges Finding 98: "[Father] was out of prison for most of 2016. He did not reach out to DCS during this time." Appellant's App. Vol. II p. 29. Father testified, and we stated in our 2016 opinion, that upon his release in early 2016 he called the FCM. We agree this finding is erroneous. Father also challenges Finding 118: "Ms. Walters attempted to supervise a parenting time session between [Child] and [Father]. However, [Father] did not appear." Appellant's App. Vol. II p. 29. We agree, and again DCS concedes, that the record does not support this finding. No parenting time was ever attempted with Father.

[19] Regarding Findings 19, 38, 98, and 118, we agree with Father that each is either wrong or misleading. However, we believe these errors to be "sufficiently minor so as not to affect the substantial rights" of Father. *See* Ind. Appellate Rule 66(A). Even without these findings, there is sufficient evidence to support the trial court's ultimate conclusions, as discussed below.

# II. Conclusions

[20] Father also challenges two of the trial court's legal conclusions, specifically, that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child and that termination is in Child's best interest.

## A. Threat to Child's Well-Being

[21] Father challenges the trial court's conclusion that there is a reasonable probability continuation of the parent-child relationship is a threat to Child's

well-being, arguing (1) any emotional stress or anxiety Child suffered was caused by DCS's missteps rather than Father and (2) Child's fears of Father were "unfounded." Appellant's Br. p. 32. While both these may be true, the trial court also found Father was a threat to Child's well-being because of Father's repeated issues with domestic violence, which were sufficient to show a threat to Child's well-being. *See* Appellant's App. Vol. II p. 31.

[22] Father's domestic violence is part of what prompted DCS to remove Child from the home in the first place, and his 2013 assault of Mother further ensured Child would remain out of the home for an extended period. *See id.* at 25, 26. In our 2016 opinion, we said that Father deserved "a genuine chance to prove that he can parent his child." *In re O.G.*, 65 N.E.3d at 1096. Father has since been given this chance and proved he cannot. Father failed to complete the DCS-referred batterer's intervention program—attending only a few classes before being unsuccessfully discharged due to lack of attendance. Even after completing a brief domestic-violence class while incarcerated, Father continued to be involved in domestic-violence incidents. Moreover, because of his frequent incarcerations, Father is unable to provide safe and stable housing.

[23] The above findings of fact support a conclusion that Father poses a threat to Child's well-being, due to his continued engagement in domestic violence and his lack of commitment toward working to improve himself or his relationship with Child.

# B. Best Interests

Father also challenges the trial court's conclusion that termination is in Child's best interests. In determining the best interests of a child, the trial court must look at the totality of the evidence. *See In re A.B.*, 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). The trial court must subordinate the interests of the parents to those of the child. *Id.* at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *In re K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, or social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

The trial court found termination to be in Child's best interest due to Child's need for stability and permanency. While stability is important in every termination case, it was particularly urgent here—as Child has now been a ward of the State for nine years. Father has not been able to provide a safe and stable home for Child, despite having almost a decade to improve. *See* Appellant's App. Vol. II p. 29. Father has a "lengthy" criminal history that has led to his incarceration for the majority of Child's life. *Id.* In 2018 and 2019 alone, Father was incarcerated on at least six occasions. Notably, even after Child was removed from the home because of Father's domestic violence, Father continued to engage in domestic violence incidents and failed to

complete DCS's batterer's intervention class. Father and Child, now nine, have no relationship, and Father has not seen Child since he was two years old.

[26] In a separate opinion issued today, we reverse the termination of Mother's rights. *See* Case No. 20A-JT-271. While we generally prefer to avoid terminating the rights of one parent while leaving the other parent's rights intact, the circumstances here warrant such an outcome. *See In re J.W.*, 779 N.E.2d 954, 963 (Ind. Ct. App. 2002) (rejecting a mother's argument that her rights should not be terminated because the child had been reunified with father), *trans. denied*. The differences in Mother's and Father's behaviors throughout the proceedings are stark. Mother's prior strong bond with Child, her consistent commitment to reunification, and her ability to maintain a safe and stable environment for Child show that—after positive reunification efforts—she can be a safe and stable presence in Child's life. In contrast, Father failed to complete DCS services, cannot provide a safe environment for Child, has not communicated with Child since 2013, and is consistently incarcerated for violent crimes.[4] It is not in Child's best interest to maintain this relationship, notwithstanding reunification with Mother.

---

[4] The State has filed two additional criminal cases against Father since he filed this appeal. Documents available on the Odyssey case-management system indicate that Father has entered into a plea agreement in a case that was filed this June, under which he will plead guilty to additional felony strangulation and felony domestic-battery charges. A change-of-plea hearing is set for later this month. In the other case, also filed in June, Father is charged with public intoxication.

As shown above, the trial court made plenty of findings that support its conclusion that continuation of the parent-child relationship with Father is not in Child's best interests. Father has had nine years to stop engaging in criminal activity so he can rebuild a relationship with Child. Forcing Child to wait even longer is not in his best interests.[5]

Affirmed.

Bailey, J., and Weissmann, J., concur.

---

[5] Father makes two other arguments that we find to be without merit. First, he argues that the trial court erred in allowing Dr. Lara Darling, Child's pediatrician, to "give an expert opinion that termination was in Child's best interest." Appellant's Br. p. 39. Dr. Darling was found by the court to be an expert in pediatric primary care. She testified that Child reported physical symptoms caused by the stress of DCS visits, therapy, the ongoing court case, and visits with Mother. She opined that "removing the stressors" would be in Child's best medical interests. Tr. Vol. III p. 222. Any error in allowing this testimony—if indeed there was an error—was harmless as it relates to Father. The trial court focused its conclusions relevant to Father on his criminal history, inability to provide a safe environment, and lack of a relationship with Child, none of which were supported by Dr. Darling's testimony. Likewise, in our discussion above, we make no mention of Dr. Darling's testimony.

Second, Father argues that the "law of the case doctrine" applies here because our 2016 opinion held "that DCS must provide services to give Father a chance to prove himself" and DCS did not. Appellant's Br. p. 24. While we did find in our 2016 opinion that "it cannot be said that all other reasonable efforts have failed, given that DCS made an explicit internal decision that it would exercise no effort whatsoever to reunify Father with Child, and proceeded to follow through with that plan," this was in the context of Father's repeated attempts—before the first termination proceeding—to be involved in the case. *In re O.G.*, 65 N.E.3d at 1096. As elaborated on above, the current facts are notably different. Since 2016, DCS has given Father the chance to prove himself, he simply did not take it.