# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2017, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

E.C. and A.C.,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services and Child Advocates, Inc.,

*Appellee-Petitioner*

November 30, 2017

Court of Appeals Case No.
49A05-1706-JT-1375

Appeal from the Marion Superior Court Juvenile Division

The Honorable Marilyn A. Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1601-JT-68

**Altice, Judge.**

## Case Summary

[1] A.C. (Father) appeals the involuntary termination of his parental rights to his son E.C., who is now three years old. Although Father is a stranger to E.C., having been incarcerated all but a couple months of the child's life, Father urges that his release from prison is imminent and that he should be granted additional time to work toward reunification. Accordingly, he contends that the trial court's termination order is clearly erroneous.

[2] We affirm.

## Facts & Procedural History

[3] E.C. was born on October 29, 2014, having been exposed to opioids due to Mother's drug use during the pregnancy. After a five-day stay in the NICU, he came home to live with Mother and Father. Father, at the time, was serving time in community corrections on home detention as the result of a 2014 conviction for Class C felony burglary.[1]

[4] On or about December 14, 2014, Father battered Mother in E.C.'s presence, resulting in Father's arrest that same night. On January 20, 2015, Father pled guilty to Class A misdemeanor domestic battery in exchange for time served and 289 days suspended to probation. Father was ordered to complete a 26-

---

[1] Father has a history of criminal convictions, arrests, and probation/parole violations dating back a number of years. Since just 2012, he has been convicted of disorderly conduct, battery, receiving stolen property, burglary, and domestic battery.

week domestic violence counseling program while on probation and to have no contact with Mother, among others. Additionally, as a result of this new offense, Father's placement in community corrections was revoked in the burglary case and he was ordered to serve the remainder of his four-year sentence in the Department of Correction (DOC).

[5] In the meantime, Mother left E.C. in the care of another individual on January 7, 2015, and did not return. This individual contacted the Indiana Department of Child Services (DCS) two days later due to Mother's apparent abandonment of E.C. The DCS took two-month-old E.C. into custody and filed a petition alleging E.C. to be a Child in Need of Services (CHINS). After the detention hearing in January 2015, Erma Watson, the Family Case Manager (FCM) assigned to E.C.'s case, visited Father in jail. FCM Watson provided Father with a summons and rights form, an incarcerated parent letter, her contact information, and other information about the CHINS proceedings. Father was also informed that the DCS would accept collect calls from him. Further, counsel was appointed to represent Father at the continued initial hearing in February 2015. Thereafter, E.C. was adjudicated a CHINS. At the dispositional hearing on June 17, 2015, services for Father were not ordered due to his incarceration. Father was directed to contact the DCS within seventy-two hours of being released.

[6] At the permanency hearing on January 6, 2016, the DCS requested that the permanency plan change from reunification to adoption due to Mother's nonparticipation with services and Father's continued incarceration. Father

objected – indicating that "he was going to engage in services during his incarceration" – and requested parenting time. *Exhibits Vol. III* at 6. The trial court denied Father's request for parenting time. Noting that "[n]either parent has addressed the issues of domestic violence or instability that led to the filing of this action", the court found that changing the plan to adoption was in E.C.'s best interests. *Id.* Accordingly, on January 21, 2016, the DCS filed a petition to terminate the parent-child relationship between Father and E.C.[2]

[7] During the pendency of the termination proceedings, Father was released from the DOC on July 14, 2016. He left one voicemail message for FCM Watson following his release but then never returned any of her calls. Father spoke with E.C.'s Guardian ad Litem (GAL) once and was informed of two upcoming hearings: July 20 in the CHINS case and July 29 in the termination case. Father did not appear for either hearing. Thereafter, Father was returned to the DOC on August 9, 2016, due to a parole violation.

[8] The trial court heard evidence in the termination case on March 27, 2017. Father argued that because his expected released date, April 28, 2017, was approaching he should be given additional time to remedy the conditions resulting in E.C.'s removal. Father noted that he completed a literacy program and obtained his high school equivalency diploma while incarcerated.

---

[2] The petition was also filed with respect to Mother, and her parental rights were terminated by default on June 20, 2016. Mother is not a participant in this appeal.

Additionally, Father testified that he planned to live and work with his brother upon release.

[9] The DCS, on the other hand, presented evidence that Father was a stranger to E.C., having had absolutely no contact with the child since infancy.[3] Father had also made no attempt while incarcerated to address his issues with domestic violence or to improve his parenting skills. He did not remain in contact with the FCM during the more than two years of the CHINS or TPR proceedings and did not attend the two hearings that took place while he was briefly out of prison. The DCS also established Father's significant history of arrests, convictions, and violations of probation or parole, which took place both before and after E.C.'s birth. Both the FCM and the GAL testified that termination of Father's rights and adoption by the foster parents were in E.C.'s best interests.

[10] On June 8, 2017, the trial court issued its order terminating the parent-child relationship between Father and E.C. Father appeals, asserting that there was insufficient evidence to terminate his parental rights to E.C. Additional facts will be provided below as needed.

**Standard of Review**

---

[3] As a result of his conviction for domestic violence, a criminal no-contact order is in effect between Father and E.C. (as well as others) and is to remain in effect through Father's probation.

[11] On review of the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015). Rather, we consider only the evidence and reasonable inferences favorable to the judgment. *Id.* Where the trial court entered findings of fact and conclusions of law, as in this case, we apply a two-tiered standard of review. *Id.* We first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* The judgment will be set aside only if it is clearly erroneous. *Id.*

## Discussion & Decision

[12] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[13] Before an involuntary termination of parental rights may occur in Indiana, the DCS is required to allege and prove by clear and convincing evidence, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). The DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[14] Father first challenges the trial court's determinations that subsections (b)(2)(B)(i) and (ii) were met. We note that the DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence. *See K.E.*, 39 N.E.3d at 646. Therefore, we focus our inquiry on the requirements of subsection (b)(2)(B)(i) – that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in the E.C.'s removal or continued placement outside Father's care will not be remedied.

[15] In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Changed conditions are balanced against habitual patterns of conduct to determine whether there is a substantial probability of future neglect." *K.E.*, 39 N.E.3d at 647. In this regard, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.*

[16] Within two months of E.C.'s birth, Father battered Mother and was incarcerated. Thus, Father was unavailable to care for E.C. upon Mother's subsequent abandonment of their infant. This resulted in E.C. being placed in nonrelative foster care, where he has thrived.

[17] Since Father's battery of Mother in December 2014, he has been incarcerated except for a very brief period in the summer of 2016. Although he completed a literacy course and earned his high school equivalency diploma, Father has made no effort to improve his parenting skills or address issues related to domestic violence through programs offered at the prison. Nor has he established any sort of bond with E.C. or maintained contact with the DCS throughout this case.

[18] At the termination hearing in March 2017, Father did not dispute these facts. He simply argued that because he was scheduled to be released on April 28,

2017,[4] he should be given additional time to pursue reunification with E.C. and engage in services through the DCS. On appeal, Father argues that Indiana law requires that additional time be given whenever a parent's release from incarceration is imminent. Father overstates the law in this regard. *See K.E.*, 39 N.E.3d at 648 ("the potential release date is only one consideration of many that may be relevant in a given case").

[19]    In *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), this court held that the incarcerated father was entitled to a continuance of the termination hearing and that the evidence was insufficient to support the termination order. Because he was to be released from prison six weeks after the scheduled hearing, the father sought a continuance in order to have an opportunity to participate in services and demonstrate his fitness as a parent. In reversing the trial court, we observed that the children had been placed with their grandmother for nearly three years and that granting the father more time would have "little immediate effect upon the children." *Id.* at 619. We also recognized that the father had "participated in numerous services and programs [in prison], which would be helpful to him in reaching his goal of reunification with his children." *Id*. In addition to advancing his education, he had "participated in nearly 1,100 hours of individual and group services, including services in encounters, anger management and impulse control,

---

[4] Although Father's release date at the time of the hearing was in April 2017, we observe that according to the DOC website he has yet to be released and his earliest release date currently is May 11, 2018.

parenting skills, domestic violence, self-esteem, self-help, and substance abuse." *Id*. at 622. With his release imminent, the father had secured employment and housing and had been accepted at the University of Evansville. During his incarceration, Father had also maintained a relationship with his children. Given the positive strides made toward turning his life around, we concluded that the evidence was insufficient to establish a reasonable probability that the conditions resulting in the children's removal would not be remedied.

[20] Although this case and *Rowlett* have similarities, their differences are considerable. Father made no effort during his significant period of incarceration to improve his parenting skills or to address the cause of his current placement – domestic violence. He has absolutely no bond with E.C. and has not worked toward reunification while in prison. Further evidence of Father's apparent lack of commitment to change is his behavior while out on parole in July and August 2016. During that brief period, he knowingly failed to attend two hearings and made no real effort to engage with the DCS. He then found himself back in prison following a parole violation. In his own words, Father has been "locked up since 2013…[p]retty much, off and on." *Transcript* at 133. Father acknowledged at the termination hearing that he also had a six-year-old daughter whom he has not seen while incarcerated and for whom he does not pay child support. He emphasized that his daughter was "blessed" to have a good mother who has custody of her. *Id*. at 128. E.C., on the other hand, was abandoned by Mother and had been a CHINS and in the

custody of the DCS, with nonrelative placement, for over two years at the time of the termination hearing.

[21] Contrary to Father's assertion on appeal, *Rowlett* does not compel a reversal in this case. Every termination case presents unique facts and under the circumstances of this case, we conclude that the trial court did not clearly err in determining that there was a reasonable probability that the conditions that resulted in E.C.'s removal and continued placement outside Father's care will not be remedied. *Cf. In re R.S.*, 56 N.E.3d 625, 631 (Ind. 2016) (reversing termination order in light of "the loving bond that R.S. and Father share, Father's successful completion of multiple self-improvement and parenting courses, Father's successful completion of probation, his repeatedly expressed desire to parent R.S., and his exercise of regular visitation"); *K.E.*, 39 N.E.3d at 643-44, 649 (reversing termination where child was in relative placement and incarcerated father had voluntarily "made extensive efforts to better himself by learning parenting skills, addressing his problems with substance abuse, and establishing a bond with both of his children"; "there is seemingly nothing else Father could have been doing to demonstrate his dedication to obtaining reunification"); *In re O.G.*, 65 N.E.3d 1080, 1096 (Ind. Ct. App. 2016) ("[n]otwithstanding the FCM's lack of direction, Father completed a parenting class while on work release and an anger management class while incarcerated" and when not incarcerated, "he made multiple attempts to contact the FCM and engage in services"), *trans. denied*.

[22] Next, Father challenges the trial court's determination that termination is in the best interests of E.C. The court found that termination would allow E.C. to be adopted into the safe and stable home where he has resided and thrived since April 2015. The court observed the GAL's opinion that it would be damaging to uproot E.C. from the only family he has known and place him with a stranger. The GAL and the FCM both opined that termination was in E.C.'s best interests.

[23] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[24]     Once again, Father attempts to liken this case to others in arguing that the trial court's conclusion was clearly erroneous. In so doing, Father ignores the distinguishing characteristics of the cases he cites. For example, in *G.Y.*, 904 N.E.2d 1257, the mother was incarcerated when her child was twenty months old for a crime she committed prior to her pregnancy. While incarcerated, she took "positive steps and made a good-faith effort to better herself as a person and a parent" and "maintained a consistent, positive relationship" with her child. *Id*. at 1262, 1264. Unlike Father, she demonstrated a "commitment to reunification with [her child] from the very point of her arrest." *Id*. at 1264. Under these specific circumstances, the Court held that the child's general need for permanency through adoption was not a sufficiently strong reason to conclude that termination was in the child's best interests.

[25]     As explained above, Father has not demonstrated the same type of commitment to reunification. He has spent his years in prison – for a crime committed after E.C.'s birth – essentially waiting until his release to attempt to make progress toward reunification with a son who does not know him. We acknowledge that Father advanced his education (resulting in time cuts) and apparently has a plan for housing and employment upon his release. But he admittedly did not take advantage of programs geared towards addressing parenting and domestic violence issues. Further, when he was out of prison after termination proceedings had begun, Father did not demonstrate a true commitment to reunification and quickly found himself back in prison. Considering the totality

of the evidence, the trial court's determination that termination is in E.C.'s best interests is not clearly erroneous.

[26] Finally, Father claims that the DCS has not established a satisfactory plan for the care and treatment of E.C. following termination. We cannot agree. The plan is for E.C. to be adopted by his foster parents, with whom he has lived since April 2015. "A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the child[]." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. The plan in this case is clearly satisfactory.

[27] Judgment affirmed.

May, J. and Vaidik, C.J., concur.