# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2018, 8:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT, C.B.

Steven J. Halbert
Indianapolis, Indiana

ATTORNEY FOR APPELLANT, H.B.

Danielle Sheff
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Matter of the Involuntary Termination of the Parent-Child Relationship of J.B. and A.H. Minor Children, <br><br> C.B. (Father), <br> H.B. (Mother), <br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services, | April 30, 2018 <br><br> Court of Appeals Case No. 49A05-1711-JT-2602 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn Moores, Judge <br> The Honorable Larry Bradley, Magistrate <br><br> Trial Court Cause No. 49D09-1608-JT-1015 <br> 49D09-1608-JT-1016 |

*Appellee-Petitioner.*

And,

Child Advocates, Inc.

*Appellee-Guardian ad Litem.*

**Barnes, Judge.**

# Case Summary

H.B. ("Mother") and C.B. ("Father") appeal the termination of their parental rights to their children. We affirm.

# Issue

The restated issue before us is whether there is sufficient evidence to support the termination of Mother's and Father's parental rights.

# Facts

Mother is the mother of K.J., born in 2000, J.B., born in 2005, and A.H., born in 2007. Father is the father of J.B. only. Mother had no contact with Father after J.B.'s conception until 2011, when J.B. began asking who his father was. Mother located Father on Facebook. Six weeks after reestablishing contact, Mother and Father married.

[4] In 2012, the Marion County Office of the Department of Child Services ("DCS") filed a petition alleging that K.J., J.B., and A.H. were children in need of services ("CHINS") because the apartment where the family was living was uninhabitable and they had no lease to live there legally. There was no running water in the apartment, and the family was using the kitchen sink as a urinal and defecating into a hole in the floor. DCS dismissed this CHINS petition a few months later when Mother moved into a Salvation Army shelter with the children.

[5] After briefly living in the shelter, the family moved in with Mother's grandparents in Danville. Both grandparents had died by August 2014, and the family thereafter moved into a rental house in Indianapolis with Mother's aunt. Five or six months later, the family was facing eviction because the aunt had moved out and Mother and Father could not afford the rent on their own.

[6] Additionally, in 2013, Father started being frequently abusive, mentally and physically, to Mother. Although Father never directly harmed the children, they did sometimes witness the abuse. In 2013, Father was convicted of Class A misdemeanor domestic battery. He violated probation for this offense when he failed to complete domestic violence counseling.

[7] On May 12, 2015, DCS filed a CHINS petition, alleging not only that the family was about to be evicted, but also that the house in which they were living was uninhabitable anyway. Specifically, the home lacked running water and electricity, it was cluttered with trash and debris, it smelled like dog feces and

rotting food, and there was vomit on the floor and bedding. On June 10, 2015, Mother and Father admitted that the children were CHINS. A.H. was placed with Mother's friend and J.B. was placed in foster care. K.J. eventually was placed in a boarding school in Pennsylvania.

[8] Mother was referred to service providers to assist her with maintaining employment and appropriate housing. From the fall of 2015 to January 2016, Mother lived with various friends and relatives or was homeless. In January 2016, Mother temporarily lived at a domestic violence shelter. She left the shelter and moved into a motel but again had periods of homelessness— sleeping in parks or abandoned buildings. By April 2016, Mother was able to obtain an apartment, although it turned out to be bug-infested and in a high-crime area.

[9] Mother and Father continued living together until September 2016, although frequent domestic violence incidents continued to occur. Mother did not always report these incidents to police. However, on September 22, 2016, Father was charged with several acts of violence against Mother. In December 2016, Father pled guilty to Level 6 felony strangulation and to being an habitual offender.

[10] In October 2016, Mother was evicted from her apartment; she claims the eviction was due to damage Father had caused to the apartment during the incident leading to his arrest and conviction. Thereafter, Mother returned to living with friends or in motels, with periods of homelessness. At the beginning

of August 2017, Mother informed her DCS caseworker that she still did not have housing. However, later that month Mother produced a lease for a house purportedly executed on August 1, 2017. The property was actually being rented by Mother's mother, supposedly under a rent-to-own arrangement with the property owner, thus making Mother a sublessee. The home did not have a kitchen.

[11] Mother's employment during the CHINS proceedings was sporadic. She worked for approximately two months at Hardee's in 2015 and quit due to transportation issues. She worked for approximately six months at a retirement center in 2016, but she did not make enough there to pay all her bills and feed herself. She worked for a few weeks at a Taco Bell in March 2017 and thereafter began working again at Hardee's, where she continued to be employed in August 2017. At that time she also was working part-time for a special events company.

[12] Mother also has a history of mental illness, particularly severe depression and self-harming. She was ordered to undergo a psychological exam at the outset of the CHINS proceedings, but she did not complete one until May 2017, because she did not think she needed one and because Father told her that he was her "therapist." Tr. Vol. II p. 117. Mother was hospitalized in Spring 2017 after a stranger called 911 to report overhearing her saying she wanted to commit suicide. She thereafter was prescribed two antidepressants and began counseling. However, by July 2017, Mother had stopped taking the medication and was no longer attending counseling.

[13] Although Mother appeared to be bonded with her children and generally behaved appropriately during supervised visitation, that visitation was suspended in February 2016 after an incident in which Mother became angry during a visit and began throwing things. Visits were resumed in December 2016 but again suspended in March 2017 due to a large number of missed visits. Also, one of Mother's counselors stopped meeting in private with Mother after Mother said during a phone call that she was going to need to murder somebody in order to visit her children.

[14] Father never completed a domestic violence program, either through his criminal cases or through DCS referral. He objected to one of Mother's counselors because he was a man and claimed the counselor was giving Mother gifts. Father's plea agreement to strangulation provided for a year of probation and two years on community corrections. However, the community corrections placement was revoked in March 2017, resulting in approximately six months of incarceration. As with Mother, his housing and employment were unstable and inconsistent throughout the CHINS proceedings. He did not maintain consistent contact or visitation with J.B., and Father and J.B. did not appear to have a close bond.

[15] In August 2016, DCS began proceedings to terminate Mother's parental rights to A.H. and J.B. and Father's parental rights to J.B.[1] The trial court held fact-

---

[1] DCS did not seek termination of Mother's parental rights as to K.J. The parental rights of A.H.'s father were terminated in a separate proceeding, and he is not a party to this appeal.

finding hearings on June 6 and August 23, 2017. Father did not appear at the June hearing. Mother testified at that hearing that she had sought advice from Legal Aid about divorcing Father and was told that she should wait until after the termination proceedings were over to pursue such an action.[2] At the August hearing, Father denied having ever battered Mother, despite his convictions for doing just that, which were the result of guilty pleas. He also testified at that hearing that he anticipated being released from jail in twenty-six days and that he planned to work thereafter through his probation department. He also said that he planned to live with relatives after his release but there were no details regarding the nature of that housing.

[16] DCS presented evidence that A.H. and J.B. were currently living in separate, pre-adoptive foster homes. The children were bonded with their foster parents and the other children in those homes; the foster homes were stable and safe and the foster parents were providing for the children's medical and educational needs. The foster parents also facilitated sibling visitation between A.H. and J.B.

On October 17, 2017, the trial court entered its order terminating Mother's and Father's parental rights. The trial court found, among other things:

> 29.    There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their mother. For over

---

[2] A counselor recalled that cost was the barrier to Mother's moving forward with a divorce.

two years [Mother] has been offered services designed to remedy conditions including mental health and instability issues but has been unable or unwilling to benefit and progress toward reunification.

30.    There is a reasonable probability that the continuation of the parent-child relationship between the children and their mother poses a threat to the children's well-being as it would be a barrier to moving the children forward to permanency.

* * * * *

44.    There is a reasonable probability that the conditions that resulted in [J.B.'s] removal and continued placement outside the home will not be remedied by his father.  [Father] has been unable or unwilling to address issues of instability, drug abuse, criminal activity, and domestic violence in the two years [J.B.'s] CHINS case has been pending.

45.    Continuation of the parent-child relationship between [J.B.] and his father poses a threat to [J.B.'s] well-being in that it would pose as a barrier to obtaining permanency for him in the home where he has bonded.

App. Vol. II pp. 32-33.  Mother and Father now appeal.

# Analysis

[17]  Mother and Father both challenge the sufficiency of the evidence supporting termination of their parental rights.  The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children.  *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).  "A

parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*). Courts need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. "Rather, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id.*

[18] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.*, 934 N.E.2d at 1132. We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions

thereon in granting DCS's petition to terminate Father and Mother's parental rights, as required by Indiana Code Section 31-35-2-8(c). *See In re N.G.*, 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016). When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *In re I.A.*, 934 N.E.2d at 1132. We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[19]  Indiana Code Section 31-35-2-8(a) provides that, "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[20] Both Mother and Father contend there is insufficient evidence that there is a reasonable probability the conditions leading to the children's removal from their care would not be remedied.[3] In order to prove this element, DCS must establish (1) what conditions led to DCS placing and retaining the children in foster care; and (2) whether there is a reasonable probability that those conditions will not be remedied. *In re I.A.*, 934 N.E.2d at 1134. When analyzing this issue, courts may consider not only the basis for the initial removal of the children, but also reasons for the continued placement of the children outside the home thereafter. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Courts must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration

---

[3] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is sufficient evidence of a reasonable probability that the conditions resulting in the children's removal from Mother and Father's care would not be remedied, and we need not address whether there is sufficient evidence that continuation of the parent-child relationship posed a threat to A.H. and J.B. *See A.D.S.*, 987 N.E.2d at 1158 n.6.

evidence of changed circumstances. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child. *Id.* Factors to consider include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Courts also may consider services offered to the parent by DCS and the parent's responses to those services. *Id.* DCS is not required to prove a parent has no possibility of changing; it need only establish a reasonable probability that no change will occur. *Id.*

[21] Here, it is plain that the primary reason for the children's removal and continued placement outside Mother and Father's care was their substantial instability with respect to housing and finances. The home where the children were living when DCS became involved in May 2015 was squalid. This was not the first time DCS had discovered the children living in such a residence, given the short-lived 2012 CHINS case. During the two years of these CHINS proccedings, Mother and Father, together or separately, did not at any time obtain sufficiently stable housing that would have allowed an attempt to place the children back into their care, despite assistance from DCS service providers. The longest period of housing stability for the parties was from April to October 2016—although the apartment they were renting was bug-infested and by Mother's own admission located in a dangerous, crime-ridden neighborhood. This living arrangement came to an end when Father damaged the apartment

during another of his violent outbursts, leading to Father's arrest, conviction, and eventual incarceration for violating the terms of his community corrections placement. Although this damage apparently was one reason for Mother's subsequent eviction, she also was behind on rent at that time. Before and after this six-month period, the parties had no stable residence, frequently were homeless—or in Father's case, incarcerated.

[22] Like the trial court, we also cannot place much stock in Mother's purported subleasing of a property her mother was leasing, evidence of which appeared only at the final hearing in this matter.[4] The circumstances surrounding that lease are suspect. Although the lease supposedly was effective August 1, 2017, Mother's DCS caseworker recalled that Mother had said at the beginning of that month that she was still trying to acquire housing. The home was not inspected by DCS for its adequacy for children—probably because they were unaware of it until the last hearing. Mother admitted that it did not yet have a kitchen, though claimed one would be put in. She also stated on cross-examination when pressed about the lease, "I just got that from my mom when she was trying to help me out." Tr. Vol. III p. 13. Given these circumstances, the purported lease is of little consequence in comparison to Mother's habitual pattern of conduct with respect to her housing. In sum, there is clear and

---

[4] Curiously, Father points to Mother's sublease as evidence that termination of *his* parental rights is not required; Father had nothing to do with the sublease and, in fact, all the evidence indicated that Mother was not interested in resuming her relationship with him when he was released from incarceration. In other words, even if Mother had stable housing—which she did not—it would be irrelevant to whether Father had stable housing—which he did not.

convincing evidence that severe housing and financial instability had led to the children's removal from Mother and Father's care and there was a reasonable probability those conditions would not be remedied.[5]

[23] Mother contends that her failure to lead a stable life during much of the CHINS proceedings was caused in large part by Father's controlling and violent behavior, from which she was attempting to extricate herself. We agree that courts must be careful not to "blame the victim" in situations such as this, as we recognized in *In re O.G.*, 65 N.E.3d 1080 (Ind. Ct. App. 2016), *trans. denied*. There, we reversed a termination of parental rights where it based largely on domestic violence between the mother and father, but the two had not been in a relationship for the two-and-a-half years preceding the termination hearing and the mother was complying with DCS requirements to address the domestic violence. Moreover, in *O.G.*, the mother's housing situation had been adequate and stable for the sixteen months preceding the termination hearing. Also, while the mother had some mental health concerns, the record indicated that she was addressing those concerns through medication and attending therapy.

[24] Here, Mother remained with Father until he was incarcerated for assaulting her in the fall of 2016. Perhaps more importantly, unlike the mother in *O.G.*,

---

[5] We recognize that DCS and courts may not make value judgments about a parent's "transient" lifestyle where there is no evidence of how it would or did harm the children, and parental rights should not be terminated simply because a parent does not have his or her own residence. *See Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 151 (Ind. 2005). The evidence here goes far beyond the parents being merely "transient" or not having their own residence; this transience was extreme and it led to the children on at least two occasions living in deplorable conditions and at risk of outright homelessness.

Mother's housing situation was highly unstable for the entirety of the CHINS proceedings. Also, there is evidence Mother suffered from severe mental health problems that she was failing to adequately address, as demonstrated by her hospitalization in the spring of 2017—after which she only briefly took prescribed medication and stopped attending therapy well before the therapist thought she was ready to do so.

[25] Even if we were to assume that most or all of Mother's problems are related to Father's violence, the ultimate consideration here is the welfare of her children. To that extent, Mother's situation could be compared to that of a mentally ill or disabled parent. It is well-settled that a parent's mental illness or disability cannot, standing alone, support the termination of parental rights. *See In re V.A.*, 51 N.E.3d 1140, 1147 (Ind. 2016). However, if such illness or disability causes a parent to be unable and unwilling to develop the skills necessary to fulfill his or her legal obligations as a parent, parental rights may be terminated. *Id.* at 1148 (citing *R.G. v. Marion County Office of Family & Children*, 647 N.E.2d 326, 330 (Ind. Ct. App. 1995), *trans. denied*). Here, whatever the root cause of Mother's instability, it still existed at the time of the termination hearing and it would have posed a clear and present danger to the welfare of the children if they were to be returned to her care.

[26] Mother also asserts that DCS failed to prove that termination of her parental rights was in the children's best interests, noting the evidence that she was bonded with the children and generally had positive interactions with them and could, at times anyway, be cooperative with DCS and its service providers. "A

parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro*, 842 N.E.2d at 374. The testimony of a child's guardian ad litem or special advocate or professional caseworkers also can be evidence that termination is in a child's best interests. *McBride v. Monroe County Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Both factors are present here: Mother and Father's past and present inability to provide adequate housing and stability, along with testimony from the CASA and the DCS case manager opining that termination was in the children's best interests.

[27] Mother and Father suggest that DCS lacked an adequate plan for the children's future. We disagree. A satisfactory plan as required for termination of parental rights need not be detailed, as long as it offers a general sense of the direction in which the children will be going after termination. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The plan here gave more than a "general sense," as DCS indicated that A.H. and J.B. would be adopted by their current foster parents. The children were well-adjusted and well-taken care of in those homes. Mother contends she and Father had concerns about J.B.'s treatment in foster care; considering this claim, however, would require us to reweigh the evidence and discount the testimony strongly in favor of the foster parents, which we cannot do. The parents' alleged concerns about K.J.'s treatment also are irrelevant, given that he was not a party to the termination proceedings. As for A.H. and J.B. not being adopted together, the parents cite no authority that

would require such a plan. In any event, the foster parents have facilitated continued visitations between the half-siblings. There is sufficient evidence DCS had a satisfactory plan for the children following termination of Mother's and Father's parental rights.

## Conclusion

[28] There is sufficient evidence to support the termination of Mother's and Father's parental rights to their children. We affirm.

[29] Affirmed.

Vaidik, C.J., and Pyle, J., concur.