ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana



FILED

Oct 21 2020, 10:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the
Parent-Child Relationship of:
O.G. II (Minor Child) and
K.T. (Mother)

K.T. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner*

October 21, 2020

Court of Appeals Case No.
20A-JT-271

Appeal from the
Marion Superior Court

The Honorable
Marilyn A. Moores, Judge

The Honorable
Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1808-JT-1031

**Vaidik, Judge.**

# Case Summary

[1] In 2016, the trial court terminated the parent-child relationship between K.T. ("Mother") and O.G. II ("Child"). We reversed, noting the significant improvements Mother had made since the Department of Child Services (DCS) became involved. On remand, Mother's stability continued. However, DCS made only minimal efforts to reunite Mother and Child, and Child largely refused to interact with Mother, having grown close with his foster family over the years. As a result, DCS again petitioned to have Mother's rights terminated, and the trial court again granted DCS's petition. And again, we reverse. While we fully acknowledge that leaving his foster family and reunifying with Mother will be very difficult for Child, a child's resistance to reunification is simply not a legitimate reason to terminate the rights of a willing and able natural parent. We remand this matter to the trial court with instructions to accomplish a prompt reunification of Mother and Child.

# Facts and Procedural History

## CHINS Proceedings and First Termination (2011-2016)

[2] The facts that follow are taken largely from our opinion reversing the first termination of rights. *See In re O.G.*, 65 N.E.3d 1080 (Ind. Ct. App. 2016), *trans. denied*. Mother and O.G. ("Father") (collectively "Parents") are the biological

parents of Child, born in April 2011.[1] In May 2011, DCS removed Child from Parents and placed him in foster care after receiving a report that Child had been left with a family friend who could not contact Mother. The following month, the trial court adjudicated Child to be a Child in Need of Services (CHINS) after Mother admitted there was a history of domestic violence between her and Father, that she tested positive for recent marijuana use, and that Father had pending criminal charges.

[3] Following the 2011 CHINS adjudication, Mother worked toward reunification with Child and made significant progress. She ended her romantic relationship with Father in 2012. She obtained safe, stable housing and maintained employment. She completed a 26-week domestic-violence course and was successfully discharged from home-based case management. She sought a mental-health evaluation and participated in treatment for anxiety and depression. She made positive progress in her home-based therapy. No concerns were ever identified regarding Mother's parenting abilities. Mother has two younger children, neither of whom have been removed or investigated by DCS. Mother visited Child consistently until the Court terminated visits in 2015. These visits were "always positive," with Mother and Child being "comfortable" together and having a "secure attachment." Tr. Vol. V p. 68.

---

[1] The trial court also terminated Father's parental rights, and he appeals. In a separate opinion issued today, we affirm the termination of his rights. *See* Case No. 20A-JT-272.

[4] Despite Mother's progress, DCS consistently hindered any reunification efforts. In August 2012, Child—who was sixteen months old—was placed in Mother's care for a trial period. DCS removed Child in November, incorrectly alleging Mother had broken a no-contact order by allowing Father to visit Child. Child was placed back in Mother's care by court order a week later but was removed for the final time and placed back in foster care in May 2013 by DCS after Mother—following the DCS safety plan given to her—called the police after Father broke into her residence and assaulted her.

[5] In June 2014, DCS moved Child from his foster home and into the home of C.L. and A.L., a pre-adoptive foster family. That same month, the trial court changed the permanency plan to adoption. Soon after, the foster parents reported that Child exhibited poor behavior after his visits with Mother, including screaming, throwing objects, and worsening bathroom behavior, although the FCM continued to report that Child was happy during the visits. In July, DCS filed a petition to terminate Parents' rights. Shortly thereafter, the foster family filed a petition to adopt Child in the Marion County probate court. In February 2015, DCS moved to dismiss the termination case (for reasons not clear in the record), which the trial court granted. However, the adoption case remained pending.

[6] The trial court suspended Mother's parenting time in March 2015. In May 2015, DCS filed another termination petition. The termination hearing was held over three days in January and February 2016. On April 28, 2016, the trial court issued an order terminating Parents' rights. Father filed a notice of appeal

on May 17. The next day, May 18, an "Adoption Summary Addendum" that had been prepared by a DCS case manager on May 9 was filed in the adoption case. The document indicated—correctly as of May 9 but incorrectly as of May 18—that there was no appeal pending. It also said that DCS consented to and recommended the adoption of five-year-old Child by his foster parents. Immediately after receiving the DCS document, the adoption court set the adoption hearing for June 10. On May 24, Mother filed her own notice of appeal in the termination case. Nonetheless, the adoption hearing went forward as scheduled on June 10. The same day, the adoption court issued an order granting the adoption and approving a name change for Child. Child was told he was adopted, and the foster family held an adoption party for him.

[7] On June 16, the foster parents moved to set aside the adoption order, given the termination appeal. They indicated that their attorney had contacted DCS on May 31 to inform DCS of the June 10 adoption hearing and was not made aware of the termination appeal. They said that they did not learn about the appeal until June 15. The adoption court granted the motion, and the adoption case was put on hold. However, Child was not told that the adoption had been set aside until almost a year later.

[8] In December 2016, this Court reversed the termination of parental rights, holding there was insufficient evidence supporting the termination. *See In re O.G.*, 65 N.E.3d 1080. Regarding Mother, we noted that any reasons for Child's removal and continued placement outside the home—domestic violence, drug use, instability, and concerning mental health—had been addressed and

improved by Mother. In fact, "Mother did precisely what DCS had hoped for—she learned and benefitted from the services they provided her." *Id.* at 1091. As such, there was no clear and convincing evidence that these issues could not be remedied. Furthermore, the record was entirely devoid of evidence that the parent-child relationship was a threat to Child's well-being. "The evidence in the record [was] unanimous" that Mother and Child had a "strong bond" and Mother showed good parenting abilities until her parenting time was suspended in March 2015. *Id.* at 1094. We noted that the decision to deny Mother's parenting time despite her substantial progress was "DCS setting her up for failure[.]" *Id.* at 1094. While acknowledging the hardship Child had been through and his need for stability, we stated "that need cannot trump a parent's fundamental constitutional right to parent her child; nor can it trump the substantial bond that still existed between Mother and Child." *Id.* Therefore, we could not say that the evidence supported the termination of Mother's rights.

## Second Termination Proceedings (2016-present)

Following our 2016 opinion, no substantial progress toward reunification was made by DCS. The permanency plan was changed to reunification in February 2017. At this point, Mother had not seen Child in almost two years, yet her repeated requests for parenting time were denied—and would continue to be denied for all of 2017. The Child and Family Team—consisting primarily of the FCM, Child's service providers, the guardian ad litem, the foster parents, and Mother—instead planned for Child to begin therapy with DCS therapist Kristy Walters, with the stated goal of "rebuilding a relationship with [Mother]." Tr.

Vol. III. p. 45. This therapy continued for almost a year, with little progress made toward reunification. The bulk of Walters's therapy sessions focused on teaching Child "coping skills." *Id.* at 48. Walters reported Child seemed "avoidant" and "unsure" when discussing Mother and his biological family. *Id.* at 47. After therapy began, the foster family reported that Child was exhibiting behavioral issues, including physical aggression, emotional outbursts, and increased agitation.

[10] As early as May 2017, the trial court ordered the parties to prepare Child for parenting time "after the next hearing" and to generate a specific plan as to how the parenting time would occur, and ordered DCS and Walters to provide Mother with regular updates on Child. Ex. Vol. I p. 241. However, Walters continued to not recommend parenting time—despite knowing DCS was waiting on her approval and instructions on how to proceed—and did not provide Mother with regular updates. Furthermore, the Child and Family Team failed to generate a specific plan regarding parenting time, as they were waiting on Walters's recommendation. The trial court reiterated the order for a parenting-time plan in August 2017, but again no plan was created. That month—six months after the plan changed to reunification—Walters showed Child pre-recorded videos of Mother. When Child did not react positively toward this progression, Walters ceased all attempts of communication between Mother and Child.

[11] In October 2017, the Child and Family Team began "getting frustrated with [Walters's]" lack of progress and sought other opinions. Tr. Vol. IV p. 231. Dr.

Laura McIntire evaluated Child in late 2017 and opined he had significant anxiety. She recommended reunification efforts either cease or ramp up, as Walters's therapy consisted of "months of talk, videos and other more subtle messages [that were] increas[ing] [Child's] anxiety" and putting him in a "painful psychological limbo." Ex. Vol. I p. 28. She also recommended the visits be brief, in a familiar setting, and activity-focused to allow Child to positively interact with Mother and to reduce his anxiety toward her.

[12] In early 2018, following Dr. McIntire's report, the court authorized Mother to have supervised parenting time pursuant to Dr. McIntire's recommendations. Despite numerous attempts, Mother only had approximately three hours of supervised parenting time in 2018. Mother was not able to have more parenting time because Child was unwilling to participate. The first visit was to occur in early February 2018, and the plan was for treatment coordinator Vincent Demyan to pick Child up from his after-school program and transport him to a therapeutic setting for the visit (a plan notably in contrast with Dr. McIntire's recommendation that visits be familiar and activity-based). Child refused to go with Demyan, and the visit was canceled. A similar attempt the next week produced the same result. In late February, Mother attended Child's basketball game and interacted positively with him afterwards. After this successful visit, Walters informed DCS that she believed reunification to be harmful to Child and would not recommend parenting time occur.

[13] In March 2018, a new therapist, Melissa Porter, began working with Child and facilitated two successful visits—at an Incrediplex game center in April and a

park in July—where Child and Mother interacted positively. No problems were reported during the visits, and Child, although sometimes timid, was "happy" and "having fun" during them. *Id.* at 38, 39. However, throughout this period Child continued exhibiting behavioral issues and often refused to attend visits. Parenting-time attempts were twice suspended by the court—in May and July—on Porter's request, and attempts ceased altogether after the visit at the park in July.

[14] After July 2018, Porter felt she had been unable to form a beneficial therapeutic relationship with Child and that she was a negative "trigger" for him. Tr. Vol. IV p. 242. She stopped engaging in therapy with Child. Despite Child's continued regression and behavioral issues, DCS neglected to assign another therapist until the court ordered it the following year. In August 2018, the trial court switched the permanency plan to adoption, and DCS again petitioned to terminate Parents' rights.

[15] The termination trial occurred over numerous days in May, August, and October 2019. DCS argued that Child's emotional well-being was threatened by the continuation of the parent-child relationship. Specifically, DCS pointed to Child's regression and avoidant behavior toward Mother despite DCS's "reasonable efforts at reunification" and emphasized that reunification would mean "removing him from [the foster family's] care, which at this point would be devastating to him." Tr. Vol. V p. 222. Numerous witnesses testified that termination should occur because of Child's behavior throughout the reunification process and so he could be adopted by the foster family. Dr.

McIntire opined that reunification was not in Child's best interests based on his "trauma response" to Mother and his "identity as a permanent member of the [foster family]." Tr. Vol. II p. 134. Walters concluded that based on Child's emotional struggles, it was clearly "not in his best interest to leave his [foster family]." Tr. Vol. III p. 140. Patti Cavanaugh, Child's guardian ad litem, also recommended termination, stating that her recommendation of termination was "more of a child's well-being issue as opposed to anything that [Mother] has or had not done since the reversal of the termination" and that her primary consideration was how "integrated" Child was with the foster family. Tr. Vol. IV p. 193.

[16] Dr. Lara Darling, Child's pediatrician, testified that Child reported headaches and stomach pain, which she believed were a response to stress, and that "in terms of the somatic symptoms and the outbursts" she believed "removing the stressors" to be in Child's best medical interest. Tr. Vol. III p. 222. Based on her appointments with Child, she identified potential stressors as "visits with the biological mother," "ongoing court cases," "multiple DCS visits," and "therapy." *Id.*

[17] Several other witnesses testified that DCS's reunification efforts were insufficient. Among those witnesses were Dr. Kimberly Lakes and Rachel Ference. Dr. Lakes, Mother's expert witness, testified that DCS's efforts at visitation were "too inconsistent and too infrequent" and "lacked the appropriate planning and support" and that DCS could have used other strategies to re-establish the parental bond. Tr. Vol. V p. 182. Ference, Mother's

current home-based therapist, testified that there did not appear to be any true attempt by the team "to help [Child] want to visit his mom" or to use different strategies to "increase his motivation." *Id.* at 141-42.

[18] Finally, there was no dispute as to Mother's stability. Mother's mother (Child's grandmother) testified that Mother lived with her and her family in a four-bedroom home on one acre in New Palestine, that Mother had "been able to consistently maintain a stable home for the last several years," and that Mother was consistently employed *Id.* at 110. Both Ward and Shimura Akins, Mother's former home-based therapist, also agreed that Mother consistently maintained appropriate housing and employment.

[19] In an order issued in January of this year, the trial court again terminated Parents' rights. Pursuant to the termination statute, Indiana Code section 31-35-2-4, the court concluded that continuation of the parent-child relationship between Mother and Child poses a threat to Child's well-being:

> Continuation of the parent-child relationship poses a threat to [Child's] well-being. [Child] has suffered significant anxiety and behavioral problems after parenting time sessions with [Mother]. Dr. McIntire, who has evaluated [Child] twice, believes that reunification would be harmful to [Child], and that [Child] is at a significant risk of emotional and behavioral risks into adulthood. [Child] has strongly expressed a desire to avoid contact with [Mother] due to his behavior before parenting time sessions. Further, [Child] has suffered physical pain and headaches which are correlated to these Court proceedings. Dr. Darling is concerned that contact with [Mother] would cause [Child's] behaviors to escalate to the point that medication would be necessary to prevent him from being a danger to himself and to

others. . . . [Child] was bounced around from placement to placement before finally finding stability with the [foster family].

Appellant's App. Vol. II p. 31. The court also concluded that termination of Mother's rights would be in the best interests of Child:

> Termination of the parent-child relationship i[s] in [Child's] best interests. Termination would allow him to be adopted into a stable and permanent home where his needs will be safely met. [Child] has been in psychological limbo for several years and has the need for certainty and stability. He has experienced distress, fears, and worry at the thought of parenting time with [Mother]. Dr. McIntire has concluded that reunification with his parents is not in [Child's] best interests. Placement with the [foster family] has been the only environment in which [Child] has experienced safety, stability, and attachment. He has resided there for nearly six (6) years, a significant portion of his life. [Mother] has been unable to build a bond with [Child][.] . . . After being a ward for nearly his entire life, and in foster care with the [foster family] for most of his life, [Child] has been in limbo for years and desperately needs permanency in his life. Ms. Walters also concluded that attempts to reunify [Child] with his biological family is not in his best interests.

*Id.* Finally, the trial court determined that DCS made reasonable efforts to reunify Child and Mother. *See id.* at 30 (Finding 136).

[20] Mother now appeals.

# Discussion and Decision

[21]    When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[22]    It is well established that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The relationship between a parent and child is one of the most valued within our culture. *Id.* at 147. Yet, parental rights are not absolute, and the best interests of the child must prevail. *Id.* But termination of parental rights remains an "extreme measure" and should only be utilized as a "last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006), *trans. denied*. "[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family." *Troxel*,

530 U.S. at 68. "State intrusion is warranted only when parents lack the ability to provide for their children." *In re D.S.*, 150 N.E.3d 292, 295 (Ind. Ct. App. 2020). Parental rights should be terminated only when parents are "unable or unwilling to meet their responsibilities as parents." *Egly v. Blackford Cnty. Dep't of Public Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992); *see also In re K.T.K.*, 989 N.E.2d at 1230.

[23] Mother contends she is a fit and available parent and thus terminating her rights is "contrary to the purpose of the termination statute and to case law." Appellant's Reply Br. p. 11. We agree. In explaining its conclusions that continuation of the parent-child relationship would pose a threat to Child and that termination is in Child's best interests, the trial court did not say a single word about Mother's fitness as a parent. Rather, it focused entirely on Child's struggles with prior reunification efforts, that future reunification efforts would be hard on Child, and that Child is comfortable with his foster family. *See* Appellant's App. Vol. II p. 31. But none of that carries any weight if Mother is a willing and able parent. *See Egly*, 592 N.E.2d at 1234. And judging by the record before us, she clearly is.[2]

---

[2] DCS does mention the trial court's finding that Dr. McIntire "noted that [Mother] demonstrated a lack of understanding and empathy for [Child] and her empathy for [Child] was secondary to her own needs." Appellant's App. Vol. II p. 28; *see* Appellee's Br. p. 41. We give this little weight. First, we note that this is not a finding of fact, but a mere recitation of a witness's statement. *See In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003) ("A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact."). Furthermore, Dr. McIntire's interview with Mother occurred in October 2017, a time when Mother had not communicated with Child in over two years and was given little to no

[24]     There is no allegation that Mother is unfit. In our 2016 opinion, we noted that Mother had addressed DCS's concerns about her ability to safely parent and that she, throughout the CHINS case, "show[ed] self-awareness, improvement, and determination to do what needed to be done." *In re O.G.*, 65 N.E.3d at 1093. Nothing has changed for the worse since our 2016 opinion. If anything, Mother has shown further improvement and stability. The trial court found, and DCS does not dispute, that Mother "currently has safe and stable housing" and is "currently employed." Appellant's App. Vol. II p. 30. There are no lingering concerns regarding domestic violence, substance abuse, or Mother's mental health. Mother has two younger children, neither of whom has been the subject of a DCS investigation. Both Mother's home-based therapist and her social worker testified that Mother is a "good parent" to her children and there are "no parenting or safety concerns." Tr. Vol. V pp. 92, 103. Mother is dedicated to Child—she has advocated for their relationship throughout nine years of CHINS proceedings and two termination hearings.

[25]     Instead of a finding of unfitness, the trial court found that Child's relationship with Mother poses a threat to Child's well-being because "[C]hild has suffered significant anxiety and behavioral problems" throughout the remand proceedings and because Child has "strongly expressed a desire to avoid contact with his mother[.]" Appellant's App. Vol. II p. 31. These are insufficient

---

information on how he was doing. By the time of the termination hearing in 2019, Mother had undergone therapy to assist her in better understanding Child's emotional state. Tr. Vol. V p. 100.

reasons to break the parent-child relationship. The emotional and behavioral problems Child experienced throughout the proceedings on remand are not the result of anything Mother did or did not do but were instead compounded by DCS's lackluster reunification attempts. Reunification was never going to be an easy road, but DCS's missteps exacerbated the already tense reunification situation.

[26] DCS notes that Child experienced trauma as a result of "the adoption fall[ing] apart" and that as such Child should be allowed to remain with the foster family. Appellee's Br. p. 39. This reliance on the botched adoption is troubling, given that DCS played a key role—and Mother played none—in allowing the adoption to go forward notwithstanding the appeal of the previous termination. That the wrongful adoption later had to be set aside no doubt caused emotional suffering. However, again, this was not the result of anything Mother did or did not do.

[27] Furthermore, the trial court's finding that "DCS has made reasonable efforts toward reunification" is clearly erroneous. *See* Appellant's App. Vol II. p. 30. The trial court ordered the permanency plan changed back to reunification in February 2017, yet instead of focusing on restoring the previously strong bond Mother and Child had, the DCS therapist spent a year working on coping skills. At this point, Mother and Child had not seen each other in almost three years— one-half of Child's life. When parenting time was finally ordered by the court, over a year after the permanency plan was changed back to reunification, DCS made minimal efforts to follow through. Numerous visits were attempted but

never occurred because Child—who was six or seven years old—did not want to attend. Mother continually suggested how parenting time could be eased into—attending Child's activities or visits occurring at the foster family's home or the biological grandmother's home—yet DCS primarily tried the same visitation attempt repeatedly, then gave up. The three visits that did occur went well. But instead of following up on the successful visits, DCS twice requested that parenting time be suspended. We do not deny that Child has experienced emotional turmoil throughout the reunification process. However, this was caused not by anything Mother did or did not do but by DCS's wrongful severing of Child's bond with Mother, the premature adoption, the inconsistent parenting time, and the therapy that placed him in a "painful psychological limbo." Ex. Vol. I p. 28.

[28] Additionally, the trial court found termination to be in the Child's best interests because it would mean Child could be "adopted into a stable and permanent home where his needs will be safely met." Appellant's App. Vol. II p. 31. However, a fit parent's rights cannot be terminated solely so the child can be adopted by another family. *See In re V.A.*, 51 N.E.3d 1140 (Ind. 2016) (holding a parent's constitutional right to raise her child cannot be terminated solely so the child is freed up for adoption or because DCS believes there is a better home available). We acknowledge the importance of permanency and stability in a child's life. But this alone cannot trump the fundamental and constitutional right parents have to the care and custody of their children. Essentially, the trial court terminated Mother's parental rights because—in the four non-consecutive

months she was allowed to attempt parenting time—she was "unable to build a bond with [Child.]" Appellant's App. Vol. II p. 31. However, Mother and Child previously had a strong bond, a bond DCS wrongly severed years ago and made no true attempt to repair. Allowing DCS to remove a child from its fit parent, stall reunification until there is no relationship left, and then claim reunification cannot occur because of the lack of relationship would set a terrifying precedent.

[29] We acknowledge that reunification could have serious psychological and emotional ramifications for Child. It is very clear that Child wishes to remain with his foster family and is not interested in returning to Mother's care. The trial court found that Child is "at a significant risk of emotional and behavioral risks into adulthood." Appellant's App. Vol. II p. 31. The court also found that Child's unwanted contact with Mother could "escalate to the point that medication would be necessary to prevent him from being a danger to himself and to others." *Id*. We do not take these concerns lightly. But the alternative is worse. DCS cannot be allowed to wrongly withhold a child from a fit, loving, and available parent for years and then ask this Court to affirm that injustice in the name of the child's happiness. This is a painful decision, and there is no happy outcome. We cannot give Mother and Child back the relationship they once had or the years they have lost together. We cannot give Child the future he wants with his foster family. We can only follow the law, which requires us to reinstate the parental rights of Mother, a willing and able natural parent.

[30]   We therefore reverse the termination of Mother's rights and remand this matter to the trial court with instructions to hold a hearing within thirty days of this opinion, at which the parties can present evidence and recommendations as to how to best proceed with a quick and safe reunification between Mother and Child. A specific plan—for actual reunification, not for further "reasonable efforts" toward reunification—should be created and adhered to. Notwithstanding Indiana Appellate Rule 65(E), this opinion is effective immediately, and the trial court need not await a certification of this opinion by the Clerk of Courts before conducting the hearing and beginning reunification. *See* Ind. Appellate Rule 1 ("The Court may, upon the motion of a party or the Court's own motion, permit deviation from these Rules."); *see also Town of Ellettsville v. Despirito*, 87 N.E.3d 9, 12 (Ind. 2017) (making opinion effective immediately notwithstanding Appellate Rule 65).

[31]   Reversed and remanded.

Bailey, J., and Weissmann, J., concur.